Curtis M. ADKINS, Individually and on behalf of others similarly situated,[1] Plaintiff,

v.

LABOR READY, INC., and Labor Ready Mid–Atlantic, Inc., Defendants.

No. Civ.A.2:00–0884.

United States District Court, S.D. West Virginia, at Charleston.

Sept. 28, 2001.

---

1. While the style of each the plaintiff's complaint and subsequent pleadings refer to Curtis Adkins as if he were the only plaintiff, this action, according to the amended complaint, is brought "on his own behalf and on behalf of others similarly situated." (Am.Compl. at 2)

Stuart Calwell, Mary McQuain, Calwell & McCormick, Charleston, WV, for plaintiff.

Niall A. Paul, Kevin L. Carr, Spilman, Thomas & Battle, Charleston, WV, Carl Trieshmann, Schnader, Harrison, Segal & Lewis, LLP, Atlanta, GA, for defendant.

## ORDER

COPENHAVER, District Judge.

This matter is before the court on defendant's motion to compel arbitration and stay proceedings, filed November 8, 2000.[2]

### I. Background

Plaintiff filed this proposed class action[3] in the circuit court of Kanawha County, West Virginia, on August 16, 2000, alleging that defendants Labor Ready, Inc., a temporary employment agency, and Labor

---

2. On December 1, 2000, plaintiff concurrently with his memorandum in opposition to defendant's motion to compel arbitration, filed a motion for leave to exceed the page limitation set forth in Local Rule of Civil Procedure 4.01. The plaintiff, having filed a responsive memorandum twenty-seven pages in length, and the plaintiff having filed a reply memorandum to the plaintiff's response, and having suffered no apparent prejudice by the length of the plaintiff's memorandum, it is OR-DERED that plaintiff's motion to exceed page limitation be, and it hereby is, granted.

3. A class or group action under the Fair Labor Standards Act is often referred to as "collective action" to distinguish it from a typical Federal Rule of Civil Procedure 23 class action. *See generally Thiessen v. General Electric Capital Corp.*, 255 F.3d 1221, 1225 (10th Cir.2001).

Ready Mid–Atlantic, Inc., its wholly owned subsidiary (collectively "Labor Ready")[4] violated "federal and state wage and hour laws and wage payment collection laws" by failing to pay for "call time, training time, travel time, [and] overtime." (Pl.'s Am. Compl. at XXX, XXXI.) While plaintiff's amended complaint, filed in state court on September 12, 2000, does not identify the "wage and hour laws" under which he proceeds, the plaintiff has since clarified that his claims are made pursuant to the Fair Labor Standards Act ("FLSA"), 29 U.S.C. § 216(b), as well as West Virginia's Minimum Wage and Maximum Hours Standards for Employees, ("Minimum Wage Act") West Virginia Code section 21–5C–1 *et. seq.*, and West Virginia's Wage Payment Collection Act, West Virginia Code section 21–5–1 ("Wage Payment Act"). (Pl.'s Mem. in Suppt.Mot.Amend Compl. at 3–4.)[5]

On November 8, 2000, Labor Ready filed a motion to compel arbitration and stay proceedings, on the basis of an arbitration agreement signed by Adkins and each other Labor Ready job applicant. Before potential employees are assigned work through Labor Ready, they must complete an application upon which they "state their work experience and trade skills, authorize Labor Ready to contact previous employers, consent to drug/alcohol testing in the event of work-related injury or illness, sign a release of claims against Labor Ready's customers, promise to follow Labor Ready's rules and acknowledge and agree to Defendants' 'Poli-

4. The United States Court of Appeals for the Fourth Circuit offered the following description of Labor Ready:

> Labor Ready is a temporary employment agency with over 200 offices nationwide. Workers seeking placement through Labor Ready must fill out an application and complete certain orientation procedures, including safety training. Applications are kept on file, and workers who have submitted applications ("incumbent workers") return to the office whenever they desire an assignment. An incumbent worker who does not want an assignment on any given day is not obligated to request or accept one.
> Assignments ordinarily last one day. Labor Ready branches observe either of two policies regarding the manner by which assignments are distributed; one policy allows workers to receive assignments by telephone, while the other requires workers to go to the Labor Ready office every morning and wait for assignments. Those who receive assignments return to the office at the end of the day for their paychecks. At the end of each day, the worker is contractually "deemed to have quit."

*National Labor Relations Bd. v. Labor Ready, Inc.*, 253 F.3d 195, 196 (4th Cir.2001).

5. According to the plaintiff's amended complaint, an employee reports to work at the Labor Ready office prior to the start of the workday where he waits on the premises until a job is assigned to him. (Pl.'s Am.Compl. at XVI.) He receives a work ticket and travels to the job site of a Labor Ready customer. (*Id.*) Upon completing the required work, the Labor Ready customer signs the employee's work ticket, whereupon the employee returns to Labor Ready offices to receive immediate payment. (*Id.*) Employees can chose to receive payment either by check drawn upon a non-local bank or by cash with a deducted fee of between $1.00 and $1.99. (*Id.* at XXIV, XXVI.)

It is the plaintiff's contention that Labor Ready employees are statutorily entitled to payment for the waiting time at Labor Ready premises, the travel time between Labor Ready premises and the assigned workplace, and time spent undergoing required training. (*Id.* at XXIX.) Plaintiff contends that if these compensable amounts of time were added to each employee's workweek, many employees would be entitled to overtime pay for amounts of time worked over 40 hours per week. (*Id.*) Plaintiff also alleges that Labor Ready employees are entitled to compensation for the cost of commuting to and from job sites at the prevailing rate of $.35 per mile. (*Id.* at XXI, XXIX.) Plaintiff further contends that Labor Ready's means of payment, which involves a deduction for cash payment, is in violation of law. (*Id.* at XXIX.)

cy Regarding Dispatch Procedures, Employment and Arbitration.'" (Pl.'s Opp.Motion Compel Arbitration at 2.) The arbitration provision is contained within an enclosed box on the employment application, entitled "Policy Regarding Dispatch Procedures, Employment, and Arbitration." The policy states in its entirety:

> I understand that I am not required to work on any particular day and whether I report in to the LABOR READY, INC. dispatch hall is always my choice. Whenever I wish to register my availability to work, I will visit the dispatch hall and sign in. I know that LABOR READY, INC. is not required to find work for me and is not required to contact me in any way in order to make work available to me. If I do not report to the dispatch hall and sign in, LABOR READY, INC. may assume that I am not available for work on that day.

> I understand that after receiving a job assignment, I am free on my own time to leave the dispatch hall and do as I wish until the job assignment starts. I understand the importance of never being late for a job assignment.

> If I have a REPEAT TICKET (defined as a request to return to the same job at a later date), I know that I am required to report my availability to LABOR READY, INC. in the manner indicated by the dispatcher at least one (1) hour before the scheduled start time and that if I do not, then LABOR READY, INC. may assume that I am not available to return to work.

> I understand that my employment with LABOR READY, INC. is on a day-to-day basis. That is, at the end of the work day, I will be deemed to have quit unless and until I request and receive a work assignment at a later date.

> I agree that any disputes arising out of my employment, including any claims of discrimination, harassment or wrongful termination that I believe I have against Labor Ready and all other employment related issues (excluding only claims arising under the National Labor Relations act or otherwise within the jurisdiction of the National Labor Relations Board) will be resolved by arbitration as my sole remedy. The arbitration shall be conducted by the American Arbitration Association under its Commercial Arbitration Rules and the decision of the arbitrator shall be final and binding. I understand that Labor Ready also agrees to arbitrate in the same manner any claims which the company believes it has against me.

> I HAVE READ AND AGREE TO THE ABOVE STATEMENTS

(Def.'s Mot.Compel Arbitration, Exhibit 1, final full paragraph of policy hereinafter "Arbitration Agreement.") (capitalization in original). Labor Ready contends that the arbitration agreement is valid, covers the plaintiff's claims, and should be enforced.

Plaintiff has filed numerous "consent forms" [6] by current and former employees

---

**6.** A class action under the Fair Labor Standards Act is comprised only of "opt-in" members, as opposed to a class action certified under Federal Rule of Civil Procedure 23, which consists of all those in the class except those who do not opt out of the class. In order to be a member of a class action under the FLSA, en employee must give "consent in writing to become such a party" with "such consent ... filed in the court in which such action is brought." 29 U.S.C. § 216(6). *See generally,* Wesley Kobylak, *Notice to Potential Class Members of Right to "Opt-in" to Class, Under § 16(B) Of Fair Labor Standards (29 U.S.C.A. § 216(B)),* 67 A.L.R.Fed. 282, 285 (1984) ("[W]hile members of the class in Rule 23 class actions must expressly request exclusion and formally withdraw from the lawsuit, or be bound by the judgment in the action, a member of the class in actions under § 216(b)

of Labor Ready who wish to join as plaintiffs in this action. The individuals who have filed consent forms are hereinafter referred to as "opt-in plaintiffs," as distinguished from named plaintiff Adkins. The consent forms, with the first filed November 26, 2000, and the most recent filed on September 21, 2001, are approximately sixty-three in number.

Plaintiff filed, on December 4, 2000, and December 26, 2000, respectively, a motion for leave to amend the amended complaint, and a supplement to that motion, seeking to add as defendants sixty-four businesses for whom the opt-in plaintiffs worked through Labor Ready (hereinafter "Labor Ready's customers" or "proposed additional defendants"), on the basis that the proposed additional defendants are "joint employers" of the plaintiff and opt-in plaintiffs along with Labor Ready. The plaintiff contends that because he and the opt-in plaintiffs performed substantially all their work under the control and supervision of Labor Ready's customers and on their work sites, Labor Ready's customers are joint employers with Labor Ready

pursuant to the "economic reality test."[7] (*Id.* at 3–4.)

Both plaintiff and defendant have filed various other motions which are not material to the issue of whether Labor Ready can compel arbitration of the plaintiff's claims against it.[8]

## II. Discussion

Labor Ready argues that plaintiff's claims against it must be stayed pending submission of this case to arbitration. Labor Ready's motions are based on sections 3 and 4 of the Federal Arbitration Act (the "Act"), 9 U.S.C. §§ 1–16. The Act embodies a "strong federal public policy in favor of enforcing arbitration agreements," and is designed to "ensure judicial enforcement of privately made agreements to arbitrate." *Dean Witter Reynolds, Inc. v. Byrd,* 470 U.S. 213, 217–19, 105 S.Ct. 1238, 84 L.Ed.2d 158 (1985). When presented with a valid arbitration agreement, "the Act leaves no place for the exercise of discretion by a district court, but instead mandates that district courts shall direct the parties to proceed to arbitration on issues as to which an arbitration agreement has been signed."[9] *Dean Witter,*

who does not file a consent to join the lawsuit as a party plaintiff can neither benefit from, nor be bound by the judgment in the suit.") (internal citations omitted).

7. The Eleventh Circuit articulated the economic reality test for determining whether labor falls within the Fair Labor Standards Act ("FLSA"), as whether the alleged employer had power to hire and fire employees, supervised and controlled employee work schedules or conditions of employment, determined rate and method of payment, and maintained employment records. *Villarreal v. Woodham,* 113 F.3d 202, 205 (11th Cir.1997).

8. In addition to the motion to compel arbitration and plaintiff's motions to amend his complaint, the other pending motions are: (1) defendant's motion to dismiss state wage claims, filed November 8, 2000; (2) defendant's motion for an order that plaintiff's class action cannot be maintained and requir-

ing plaintiff to file an amended complaint eliminating all class action claims, filed November 8, 2000; (3) plaintiff's motion for an order directing Labor Ready to preserve evidence, filed December 8, 2000; (4) plaintiff's motion for order naming opt-in plaintiffs as party plaintiffs, determining that action is a class action, authorizing notice to potential class members and directing the procedure for opt-in plaintiffs, filed December 26, 2000.

9. The benefits of arbitration are well-documented. The Fourth Circuit in *Hooters of America, Inc. v. Phillips,* 173 F.3d 933 (4th Cir.1999) outlined some of its advantages:

The arbitration of disputes enables parties to avoid the costs associated with pursuing a judicial resolution of their grievances. By one estimate, litigating a typical employment dispute costs at least $50,000 and takes two and one-half years to resolve.

470 U.S. at 218, 105 S.Ct. 1238. Once the court determines that a claim falls within the scope of an arbitration provision, the court has no authority to consider the merits of the claim, even if it appears to be frivolous, and must order the claim to arbitration. *See AT & T Technologies, Inc. v. Communications Workers of America,* 475 U.S. 643, 649, 106 S.Ct. 1415, 89 L.Ed.2d 648 (1986).

Section 1 of the Act provides that the Act applies to contracts involving commerce but specifically excludes from the Act's coverage "contracts of employment of seamen, railroad employees, or any other class of workers engaged in foreign or interstate commerce." 9 U.S.C. § 1. Section 2 of the Act provides that written agreements to arbitrate "a controversy thereafter arising out of such contract or transaction, or the refusal to perform the whole or any part thereof, or an agreement in writing to submit to arbitration an existing controversy arising out of such a contract, transaction, or refusal, shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract." 9 U.S.C. § 2. Section 3 provides that, upon being satisfied that an issue involved in a lawsuit is one subject to arbitration under an arbitration agreement, a court may stay all proceedings pending resolution of the arbitration. 9 U.S.C. § 3. Section 4 gives district courts authority to compel arbitration when a party neglects or refuses to arbitrate a controversy subject to arbitration under an arbitration agreement. 9 U.S.C. § 4.

Both sections 3 and 4 "call for an expeditious and summary hearing, with only restricted inquiry into factual issues." *Glass v. Kidder Peabody & Co., Inc.,* 114 F.3d 446, 453 (4th Cir.1997). When considering a motion brought under section 3 or 4 of the Act, a court must:

> conduct a substantive arbitrability inquiry—meaning the court "engage[s] in a limited review to ensure that the dispute is arbitrable—i.e., that a valid agreement to arbitrate exists between the parties and that the specific dispute falls within the substantive scope of that agreement." If "the court determines that an agreement exists and that the dispute falls within the scope of the agreement, it then must refer the matter to arbitration without considering the merits of the dispute."

*Id.* (quoting *PaineWebber, Inc. v. Hartmann,* 921 F.2d 507, 511 (3d Cir.1990)).

Plaintiff contends that for a number of reasons, the arbitration clause he executed is unenforceable. Plaintiff claims that (1) the joint employers that he seeks to add as defendants were not signatories to the arbitration provision, rendering his claims non-arbitrable; (2) the language of the arbitration clause does not cover wage claims; (3) the employment application containing the arbitration agreement provision is not a valid contract; (4) the FAA is inapplicable to his claims because the members of the proposed class of plaintiffs were engaged in interstate commerce, bringing their employment applications under the Section 1 exclusion for "contracts of employment of seamen, railroad employees, or any other class of workers engaged in foreign or interstate commerce;" (5) the plaintiff's state law claims are not subject

---

Further, the adversarial nature of litigation diminishes the possibility that the parties will be able to salvage their relationship. For these reasons parties agree to arbitrate and trade "the procedures and opportunity for review of the courtroom for the simplic-

ity, informality, and expedition of arbitration."

*Id.* at 936 (quoting *Gilmer v. Interstate/Johnson Lane Corp.,* 500 U.S. 20, 31, 111 S.Ct. 1647, 114 L.Ed.2d 26 (1991) (internal citations omitted)).

to an arbitration agreement; and (6) arbitration interferes with the plaintiff's right to pursue a class claim. The court will address each of plaintiff's contentions. However, the plaintiff's questions concerning the validity of the agreement to arbitrate must be resolved before the court proceeds to the plaintiff's remaining arguments for non-application of the arbitration provision.

The court begins its analysis by noting that there appears to be an overwhelming recent trend of courts relying upon the "strong federal public policy in favor of enforcing arbitration agreements" (*See Dean*, 470 U.S. at 216, 105 S.Ct. 1238) to enforce arbitration provisions for employment-related claims. *See, e.g., Circuit City Stores, Inc. v. Adams*, 532 U.S. 105, 121 S.Ct. 1302, 149 L.Ed.2d 234 (2001) (FAA's provisions apply to arbitration agreements covering employment-related claims insofar as the employee is not a transportation worker); *Green Tree Financial Corp.–Alabama v. Randolph*, 531 U.S. 79, 121 S.Ct. 513, 148 L.Ed.2d 373 (2000) (in purported class action claim, arbitration agreement that fails to mention arbitration costs and fees is not per se unenforceable on theory that it does not affirmatively protect a party from steep arbitration costs); *Gannon v. Circuit City Stores, Inc.*, 262 F.3d 677, 2001 WL 930550 (Aug. 17, 2001, 8th Cir.) (reversing district court's order denying motion to compel arbitration and concluding that invalid provision of arbitration agreement limiting punitive damages could be severed from otherwise valid arbitration agreement); *Bradford v. Rockwell Semiconductor Systems, Inc.* 238 F.3d 549 (4th Cir.2001) (affirming district court's order of arbitration in age discrimination action, finding that fee-splitting provision that required employee to pay half of the arbitrator's fees and costs did not render mandatory arbitration agreement unenforceable); *Has-*

*kins v. Prudential Ins. Co. of America*, 230 F.3d 231 (6th Cir.2000) (reversing district court's denial of employer's motion to compel arbitration, concluding that employee of financial services firm would be required to arbitrate his race and age discrimination claims against firm pursuant to arbitration agreement, even though agreement did not specifically delineate claims subject to arbitration, firm did not provide employee with copy of arbitration rules, and firm's agents failed to discuss arbitration clause with employee). *Cf. Perez v. Globe Airport Sec. Services, Inc.*, 253 F.3d 1280 (11th Cir.2001) (finding arbitration provision in employment contract to be unenforceable in light of an illegal provision of arbitration agreement stating that costs of arbitration would be shared equally between employee and employer, which provision denied the Title VII claimant the statutory entitlement to cost and attorney fees).

### A. *Validity of Contract*

In his memorandum in opposition to defendant's motion to compel arbitration, the plaintiff raises numerous questions concerning the validity of the agreement to arbitrate. The plaintiff subdivides this argument into three sections: (1) no offer and acceptance, (2) not "bargained for," and (3) no consideration. (Pl's Opp.Mot.Compel Arbitration at 13–20.) The arguments contained within each subsection are largely duplicative of one another and the court will consequently address separately the substantive arguments relating to the validity of the arbitration agreement.

Plaintiff claims that because the arbitration agreement is contained in an employment application and not an employment contract, there was no consideration offered in return for plaintiff's acceptance of the arbitration provision. (Pl.'s

Opp.Mot.Compel Arbitration at 13–14, 19.) Plaintiff also claims that inasmuch as the agreement states that the employee's relationship with Labor Ready terminates at the end of each day's work, the agreement is not legally binding after the first day of work. (*Id.*) Plaintiff alleges that there was no "meeting of the minds" between the proposed class of plaintiffs, who are largely "unskilled laborers with a marginal education" and Labor Ready, "a giant conglomerate." (*Id.* at 15–17.) Plaintiff offers the affidavits of eleven former Labor Ready employees stating that the arbitration provision was not explained to them, that they were not given any written information regarding arbitration, and that they do not understand the meaning of "arbitration." (Pl.'s Opp.Mot.Compel Arbitration, Exhibit 3.) Plaintiff further alleges that the fee-splitting arrangement of the AAA renders the arbitration provision invalid. (*Id.* at 18–19.)

■ Arbitration agreements are a matter of contract and are controlled by contract law. *See Arnold v. United Companies Lending Corp.,* 204 W.Va. 229, 511 S.E.2d 854 (1998). In determining whether a valid arbitration agreement arose between two parties, a federal court should look to the state law that ordinarily governs the formation of contracts. 9 U.S.C. § 2; *First Options of Chicago, Inc. v. Kaplan,* 514 U.S. 938, 943, 115 S.Ct. 1920, 131 L.Ed.2d 985 (1995). However, while applying state contract law, the court is nonetheless to give "due regard ... to the federal policy favoring arbitration, and ambiguities as to the scope of the arbitration clause itself must be resolved in favor of arbitration." *Volt Information Sciences, Inc. v. Board of Trustees of Leland Stanford Junior University,* 489 U.S. 468, 476, 109 S.Ct. 1248, 103 L.Ed.2d 488 (1989). In the present case, because the named plaintiff apparently executed the arbitration agreement in West Virginia, the court looks to the contract law of that state.

■ In West Virginia, "[i]t is presumed that an arbitration provision in a written contract was bargained for and that arbitration was intended to be the exclusive means of resolving disputes arising under the contract; however, where a party alleges that the arbitration provision was unconscionable or was thrust upon him because he was unwary and taken advantage of, or that the contract was one of adhesion, the question of whether an arbitration provision was bargained for and valid is a matter of law for the court to determine by reference to the entire contract, the nature of the contracting parties, and the nature of the undertakings covered by the contract." *Smithson v. United States Fidelity & Guaranty Company,* 186 W.Va. 195, 411 S.E.2d 850, 856 n. 8 (1991) (quoting Syl. Pt 3, *Board of Education v. W. Harley Miller, Inc.,* 160 W.Va. 473, 236 S.E.2d 439 (1977)).

### 1. Bargaining Power

■ In West Virginia, inequity of bargaining power alone does not indicate an unconscionable contract.[10] Rather, "gross inadequacy in bargaining power, together with terms unreasonably favorable to the stronger party, may confirm indications that the transaction involved elements of deception or compulsion or may show that the weaker party had no meaningful, no real alternative, to the unfair terms." *Art's Flower Shop, Inc. v. Chesapeake and Potomac Tel. Co.,* 186 W.Va. 613, 413 S.E.2d 670, 674 (1991) (quoting Restatement (Second) of Contracts 234 comment

---

**10.** While the plaintiff does not actually use the term "unconscionable" to describe the arbitration agreement, the substance of his arguments seem to imply as much.

d).[11] The court can assume that often, a Labor Ready job applicant will have significantly less bargaining power than a Labor Ready representative. However, a lack of bargaining power only implicates the validity of a contract when the contractual terms are also favorable to the stronger party. *See Flower Shop*, 413 S.E.2d at 674.

■ There is nothing inherently unfair or inequitable about arbitration agreements in general. In fact, as noted above, courts have consistently lauded the merits of arbitration as a means to resolve conflicts. Moreover, it does not appear that the arbitration provision at issue is unduly favorable to Labor Ready. The agreement appears to place the same obligations and conditions upon both Labor Ready applicants and Labor Ready. It appears from the face of the arbitration agreement that both plaintiff and defendant agreed to subject any disputes arising out of the plaintiff's employment to binding arbitration conducted by the American Arbitration Association ("AAA"). (*See* Arbitration Agreement. "I understand that Labor Ready also agrees to arbitrate in the same manner any claims which the company believes it has against me."). This case is distinguishable from situations where the arbitration agreement limits the employ-

ee's means of redress of injury to binding arbitration while leaving the employer free to seek judicial redress of injury. *See generally, Johnson v. Circuit City Stores*, 148 F.3d 373, 378–79 (4th Cir.1998) (finding sufficient consideration in arbitration agreement where both employer and employee agreed to submit all employment-related claims to binding arbitration). Nor does it represent the case where an employer is contractually vested unequal power and rights within the arbitration forum. *See, e.g., Hooters of America, Inc. v. Phillips*, 173 F.3d 933, 939–40 (4th Cir. 1999) (relying on AAA as a model to contrast the arbitration practices observed by the defendant employer in a sexual harassment suit, to conclude that the restaurant's unfair advantages during arbitration proceedings rendered the arbitration clause invalid). Consequently, the court finds that any unequal bargaining power between the parties does not render the arbitration agreement unconscionable inasmuch as the resulting contractual terms do not appear to be unduly (or indeed, at all) favorable to the stronger party.

### 2. *Failure to Provide Explanation of Arbitration*

■ Plaintiff alleges that the defendant's failure to give applicants a copy of

---

**11.** Comment d to Restatement (Second) of Contracts 208, which appears to be the current citation for the referenced provision states in its entirety:

> d. Weakness in the bargaining process. A bargain is not unconscionable merely because the parties to it are unequal in bargaining position, nor even because the inequality results in an allocation of risks to the weaker party. But gross inequality of bargaining power, together with terms unreasonably favorable to the stronger party, may confirm indications that the transaction involved elements of deception or compulsion, or may show that the weaker party had no meaningful choice, no real alternative, or did not in fact assent or appear to

assent to the unfair terms. Factors which may contribute to a finding of unconscionability in the bargaining process include the following: belief by the stronger party that there is no reasonable probability that the weaker party will fully perform the contract; knowledge of the stronger party that the weaker party will be unable to receive substantial benefits from the contract; knowledge of the stronger party that the weaker party is unable reasonably to protect his interests by reason of physical or mental infirmities, ignorance, illiteracy or inability to understand the language of the agreement, or similar factors.

*Id.*

their application or an employee handbook and the defendant's failure to offer explanations of the arbitration process render invalid the arbitration provision. However, there is no requirement that the more sophisticated party to a contract offer the less sophisticated party an oral explanation of the terms of the contract, nor is the more sophisticated party obligated to provide copies of the contract to the less sophisticated one. *See generally, Haskins v. Prudential Ins. Co. of America,* 230 F.3d 231 (6th Cir.2000) (employee of financial services firm would be required to arbitrate race and age discrimination claims although employer did not provide employee with copy of association's arbitration rules and none of employer's agents discussed arbitration clause with employee). These are simply factors to be considered in determining whether there was a meeting of the minds, while operating under the general presumption that parties to a contract assented to its terms. *See e.g., Board of Ed. of Berkeley County v. W. Harley Miller, Inc.,* 160 W.Va. 473, 236 S.E.2d 439, 447–48 (1977). A court can assume that a party to a contract has read and assented to its terms, and absent fraud, misrepresentation, duress, or the like, the court can assume that the parties intended to enforce the contract as drafted. *See id.* Moreover, in an arbitration provision, "as with any other contract, the parties' intentions control, but those intentions are generously construed as to issues of arbitrability". *Mitsubishi Motors Corp. v. Soler Chrysler–Plymouth, Inc.,* 473 U.S. 614, 626, 105 S.Ct. 3346, 87 L.Ed.2d 444 (1985).

The plaintiff does not allege that he was fraudulently induced to enter into the contract or led to execute the provision as a result of duress or material misrepresentation. As stated above, the provisions of the arbitration agreement appear to be fair and even-handed. The plaintiff has not set forth evidence or argument, nor has he requested additional discovery on the issue, to rebut the presumption that a party to a contract is charged with knowledge of its terms. Considering the entire arbitration agreement, the nature of the contracting parties, and the nature of the undertakings covered by the agreement (*Smithson v. United States Fidelity & Guaranty Company,* 411 S.E.2d at 856 n. 8), it appears that the failure of Labor Ready to orally explain the terms of the arbitration agreement or to provide plaintiff with written material, does not render the agreement unconscionable.

### 3. *Arbitration Agreement as a Part of Employment Application*

■ With respect to the plaintiff's claim that there was no consideration for the arbitration clause contained in a mere employment application rather than an employment contract, the court finds persuasive the reasoning of the Fourth Circuit in *Johnson v. Circuit City Stores,* 148 F.3d 373 (4th Cir.1998). In *Johnson,* the plaintiff completed an employment application and executed an arbitration provision requiring her "to arbitrate any legal dispute related to [her] application for employment or employment with Circuit City." *Id.* at 374. Circuit City moved for summary judgment on plaintiff's claims of race discrimination, alleging that the plaintiff was bound by the arbitration provision. The Fourth Circuit vacated the district court's denial of the motion for summary judgment, concluding that the agreement was supported by consideration inasmuch as the agreement contained a mutual commitment by Circuit City and the plaintiff to bind themselves to arbitration. *See also Equal Employment Opportunity Commission v. Waffle House,* 193 F.3d 805 (4th Cir.1999) (enforcing arbitration provision contained in "generic, corporation-wide"

employment application). Applying the analysis in *Johnson*, it was not necessarily an offer of employment which formed the basis of the consideration underlying the arbitration provision; rather, it was the joint offer of the applicant and the employer to submit employment related-claims to arbitration that constituted valid consideration for the arbitration agreement.[12]

### 4. *Purported Daily Termination of Employment Relationship*

■ The court does not find compelling the plaintiff's argument that since the employment relationship is purported to end each day, the arbitration agreement is invalid after the first day of work. The analysis of the Fourth Circuit in the case of *Waffle House*, cited above, is useful. In *Waffle House*, the plaintiff executed an arbitration agreement as a part of an employment application for a Columbia, South Carolina, Waffle House restaurant, and was ultimately hired to work, without filling out another application, at a restaurant in West Columbia. *Id.* at 806. The Fourth Circuit rejected the reasoning of the district court that the arbitration agreement in the employee's application did not govern his employment relationship with Waffle House because it was submitted to a different Waffle House restaurant than the one at which he was ultimately hired, *Id.* at 807. The court considered the fact that the employee did not fill out another application prior to beginning work at the West Columbus location. *Id.* It could be assumed, the court reasoned, that Waffle House did not allow the plaintiff to begin work without utilizing the information such as "proper name, address, social security number, age and other personal data" contained in the original employment application. *Id.* at 808. Thus, the court concluded, the employment application and the arbitration provision it contained, followed the employee to whichever facility of Waffle House ultimately hired him. *Id. See also Johnson*, 148 F.3d at 378–79 ("Although the plaintiff was not hired by Circuit City and thus never became an employee, she was nonetheless bound by the terms of the arbitration provision contained in her application pertaining to any legal dispute related to [her] application for employment or employment with Circuit City.")

Similarly, although the Labor Ready employment application provides that the employment relationship ends each day, employees do not fill out a new application prior to each day of work. It can be assumed, as it was in the *Waffle House* scenario, that Labor Ready utilizes the information provided on the application for each subsequent employment assignment. Thus, the original application and its incorporated arbitration provision, stay with the employee until a new application is completed. *See generally, National Labor Relations Board v. Labor Ready*, 253 F.3d 195, 198–99 (4th Cir.2001) (despite contractual provision that employee is "deemed to have quit" after each day of work, in practice, employment relationship often continued for several days, and for purposes of National Labor Relations Act, employment relationship with Labor Ready continued overnight).

### 5. *Fee–Splitting*

■ Plaintiff alleges that the arbitration agreement is invalid as the AAA requires parties to split fees. Without offering spe-

---

12. Labor Ready asserts that its offer to consider plaintiff for employment should he complete the application and execute the arbitration agreement, constituted the consideration underlying the arbitration agreement. (Def.'s Reply Mot.Compel Arbitration at 8–9.) This contention also appears to have merit.

cific allegation or information pertaining to the fees the plaintiff believes he will incur, the plaintiff alleged generally that "the 'Policy Regarding Dispatch Procedures, Employment and Arbitration' requires the employee to pay some or all of the costs of arbitration." (Pl.'s Opp.Mot.Compel Arbitration at 18.) According to the Supreme Court, where "a party seeks to invalidate an arbitration agreement on the ground that arbitration would be prohibitively expensive, that party bears the burden of showing the likelihood of incurring such costs." *Green Tree Financial Corp–Alabama v. Randolph,* 531 U.S. 79, 81, 121 S.Ct. 513, 148 L.Ed.2d 373 (2000). In *Green Tree,* the Court compelled arbitration, finding the plaintiff's "unfounded assumptions" regarding costs to be "speculative." *Id.* Similarly, while it may be the case that the provisions of the commercial rules of the AAA mandate some type of fee-splitting, the plaintiff has presented the court with no argument or evidence that it is likely to incur prohibitive costs.

Having determined that the parties entered into a valid agreement to arbitrate, the court now turns to issues of coverage and the applicability of the FAA. *See Glass v. Kidder Peabody & Co., Inc.,* 114 F.3d 446, 453 (4th Cir.1997).

### B. *Claims Against Non–Signatories*

The plaintiff claims that the customers of Labor Ready, which he seeks to add as defendants, cannot invoke the arbitration provision as they are not signatories to the agreement. It is unclear whether plaintiff contends that the lack of an arbitration agreement between plaintiff and proposed "joint employer" defendants precludes Labor Ready, a signatory to the agreement, from compelling arbitration of plaintiff's claims against it. The court concludes that it does not.

■ When a signatory to an arbitration agreement makes an appropriate motion for an order of arbitration, the court is not precluded from ordering the arbitration simply because there are pending claims against a non-signatory. *See, e.g., Moses H. Cone Memorial Hospital v. Mercury Construction Corp.,* 460 U.S. 1, 103 S.Ct. 927, 74 L.Ed.2d 765 (1983) (district court was bound to enforce a valid arbitration provision notwithstanding concurrently pending claims of a similar nature in state court against a non-signatory to the agreement, resulting in "piecemeal resolution" of plaintiff's claims). *See also Dean Witter Reynolds v. Byrd,* 470 U.S. 213, 222, 105 S.Ct. 1238, 84 L.Ed.2d 158 (1985) (concluding, in case with both arbitrable and non-arbitrable claims, that "neither a stay of proceedings, nor joined proceedings, is necessary to protect the federal interest in the federal-court proceeding" and that bifurcation of arbitrable from non-arbitrable claims was appropriate). It is clear that if the court concludes that plaintiff and Labor Ready have a valid agreement to arbitrate covering the plaintiff's claims, then an order of arbitration is appropriate notwithstanding the possibility that plaintiff may have claims against non-signatories to the agreement.

Moreover, while not directly at issue, the court notes that it is conceivable that Labor Ready's customers, if added as defendants in this action, may be entitled to arbitration of the claims against them. There are situations in which a party to an arbitration agreement is equitably estopped from raising, as a defense, that a non-signatory to the agreement seeks to compel arbitration. The Eleventh Circuit Court of Appeals described these situations as falling into two categories:

> First, equitable estoppel applies when the signatory to a written agreement containing an arbitration clause must rely on the terms of the written agree-

ment in asserting its claims against the nonsignatory. When each of a signatory's claims against a nonsignatory makes reference to or presumes the existence of the written agreement, the signatory's claims arise out of and relate directly to the written agreement, and arbitration is appropriate. Second, application of equitable estoppel is warranted when the signatory to the contract containing an arbitration clause raises allegations of substantially interdependent and concerted misconduct by both the nonsignatory and one or more of the signatories to the contract. Otherwise the arbitration proceedings between the two signatories would be rendered meaningless and the federal policy in favor of arbitration effectively thwarted.

*MS Dealer Service Corp. v. Franklin,* 177 F.3d 942, 947 (11th Cir.1999). *See also J.J. Ryan & Sons, Inc. v. Rhone Poulenc Textile, S.A.,* 863 F.2d 315, 320–21 (4th Cir.1988) ("When the charges against a parent company and its subsidiary are based on the same facts and are inherently inseparable, a court may refer claims against the parent to arbitration even though the parent is not formally a party to the arbitration agreement.").

In *MS Dealer,* the court found that the second situation applied. An auto service corporation who was not a signatory to an arbitration agreement between an auto purchaser and a dealer filed a petition to compel the buyer to arbitrate her state court action against the service corporation in which action she alleged that the service corporation and the dealer had engaged in a fraudulent scheme to defraud her. The Eleventh Circuit reversed the district court's order denying the auto service's petition to compel arbitration, finding that the claims against the two were "based upon the same facts" and "inherently inseparable." *Id.* at 947.

The second situation also appears to apply to the claims against Labor Ready and the proposed additional defendants. The plaintiff alleges that Labor Ready's customers, as joint employers of the proposed class members, are jointly liable for Labor Ready's wage violations. (Pl.'s Mot. Amend Compl. at 5–6.) In fact, it is the plaintiff's contention that the proposed additional defendants may be indispensable parties pursuant to Federal Rule of Civil Procedure 19, having such an interest in the controversy as to require their presence in the case. (*Id.* at 5.) The plaintiff does not seek to distinguish his claims against Labor Ready from those against the Labor Ready customers. Rather, it appears that the plaintiff intends to simply add as defendants Labor Ready's employers without altering the allegations in his complaint. Thus, the alleged misconduct of the proposed additional defendants, appears to be "inherently inseparable" from the claims against Labor Ready. While no party has attempted to compel arbitration of the claims against the proposed additional defendants, it appears that the plaintiff may be equitably estopped from raising, as a defense to any such motion that may be filed, the fact that Labor Ready's customers are non-signatories to the agreement. At a minimum, the lack of an explicit arbitration agreement between plaintiff and the proposed additional defendants does not render the plaintiff's claims against Labor Ready non-arbitrable.

## C. *Scope of Arbitration Provision*

 The plaintiff alleges that the language of the arbitration provision does not cover his claims for wage violations. Plaintiff alleges that a "Labor Ready employee's wage rate, hours of employment and wage payment are generally not negotiated at the time of his/her application for employment." (Pl.'s Opp.Motion Compel

Arbitration at 12.) According to the plaintiff, because these items are not contained in the employment application, they cannot be considered as falling within the scope of arbitration clause.

The language of the arbitration provision is expansive, covering "any disputes arising out of [the signatory's] employment ... and all other employment related issues." (Arbitration Agreement.) The court is obligated to construe the arbitration clause broadly, resolving any doubts about its coverage in favor of arbitration. *See e.g., Moses H. Cone Memorial Hosp. v. Mercury Constr. Co.*, 460 U.S. 1, 24–25, 103 S.Ct. 927, 74 L.Ed.2d 765 (1983) ("As a matter of federal law, any doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration, whether the problem at hand is the construction of the contract language itself or an allegation of waiver, delay, or a like defense to arbitrability."); *United Steelworkers of America v. Warrior & Gulf Navigation Co.*, 363 U.S. 574, 582–83, 80 S.Ct. 1347, 4 L.Ed.2d 1409 (1960) ("An order to arbitrate the particular grievance should not be denied unless it may be said with positive assurance that the arbitration clause is not susceptible of an interpretation that covers the asserted dispute."); *Peoples Sec. Life Ins. Co. v. Monumental Life Ins. Co.*, 867 F.2d 809, 812 (4th Cir.1989) ("the heavy presumption of arbitrability requires that when the scope of the arbitration clause is open to question, a court must decide the question in favor of arbitration.").

By its plain language the agreement does not purport to limit its scope to only contemporaneously created documents. (*See* Arbitration Agreement.) Vesting the arbitration agreement with a "heavy presumption" of inclusiveness, it is clear that disputes pertaining to wages, hours, and wage payment can be construed as "employment related issues." *See Peoples Sec. Life Ins.*, 867 F.2d at 812. The arbitration agreement appears to easily encompass the subject of the plaintiff's claims.

### D. *State Law Claims*

■ The plaintiff maintains that the West Virginia Supreme Court would not uphold an arbitration agreement to defeat the plaintiff's state law claims. In support of this contention, the plaintiff cites to two cases of the West Virginia Supreme Court wherein the court declined to enforce an arbitration provision contained in employment contracts where the employees made claims of discrimination, one under the West Virginia Human Rights Act and one under the West Virginia Mine Safety Act. *See Copley v. NCR Corp.*, 183 W.Va. 152, 394 S.E.2d 751, 756 (1990) ("under West Virginia law, an arbitration clause in an employment contract cannot defeat a human rights action filed by the claimant pursuant to [the West Virginia Human Rights Act]"); Syl. pt. 2, *Davis v. Kitt Energy Corp.*, 179 W.Va. 37, 365 S.E.2d 82 (1987) ("A miner against whom an arbitration decision has been rendered under a collective bargaining agreement involving a safety claim is not foreclosed from pursuing a discrimination remedy under [Mine Safety Act]."). Both of these cases relied heavily upon the United States Supreme Court case of *Alexander v. Gardner–Denver Co.*, 415 U.S. 36, 94 S.Ct. 1011, 39 L.Ed.2d 147 (1974) which held that an employee's statutory right to pursue a racial discrimination claim under Title VII was not foreclosed by his prior submission of the claim to arbitration under a nondiscrimination clause of a collective bargaining agreement. The decision in *Alexander* was, however, largely abrogated by the Supreme Court's 1991 decision of *Gilmer v. Interstate/Johnson Lane Corp.*, 500 U.S. 20, 111 S.Ct. 1647, 114 L.Ed.2d 26 (1991), in which the Supreme Court concluded

that an employee's age discrimination claim under the Age Discrimination in Employment Act ("ADEA") was subject to a compulsory arbitration agreement contained in his securities registration application. It is questionable, then, whether the West Virginia Supreme Court would, in light of the *Gilmer* decision, decline to enforce an arbitration agreement for a discrimination claim.[13]

Further, the cases cited by plaintiff only implicate the validity of arbitration clauses involving invidious discrimination. There has been no suggestion that the West Virginia Supreme Court would declare void an otherwise valid arbitration provision whenever a plaintiff asserted *any* claim arising under a West Virginia statute. In fact, such a conclusion would be contrary to the observation of the United States Supreme Court that "[b]y agreeing to arbitrate a statutory claim, a party does not forgo the substantive rights afforded by the statute; it only submits to their resolution in an arbitral, rather than a judicial, forum." *Mitsubishi Motors Corp. v. Soler Chrysler–Plymouth, Inc.*, 473 U.S. 614, 628, 105 S.Ct. 3346, 87 L.Ed.2d 444 (1985).

Moreover, the court notes that it appears that the Minimum Wage Act is inapplicable to Labor Ready. The Act contains an exclusion for "any individual, partnership, association, corporation, person or group of persons or similar unit if eighty percent of the persons employed by him are subject to any federal act relating to minimum wage, maximum hours and overtime compensation." W.Va.Code § 21–5C–1. The FLSA is a "federal act relating to minimum wage, maximum hours and overtime compensation" within the meaning of the West Virginia Code. *See* 29 U.S.C. 201 *et seq.* The FLSA, in turn, covers all employees of an enterprise if the enterprise engages in interstate commerce and if the enterprise has an annual business volume of at least $500,000. *See* 29 U.S.C. § 203(s)(1). The plaintiff alleges and Labor Ready concedes that Labor Ready and its employees are covered by the FLSA.[14] Accordingly, it appears that the state Minimum Wage Act is inapplicable to Labor Ready.

### E. *FAA § 1 Exclusions*

Plaintiff contends that Labor Ready's temporary employees are "engaged in interstate commerce" in that they work in the areas of "construction, landscaping, warehousing, catering, moving, hotel, stevedoring, [and] light industrial markets," bringing their employment contracts under the exclusion for "seamen, railroad employees, or any other class of workers engaged in foreign or interstate commerce." (Pl.'s Opp.Mot.Compel Arbitration at 22.) The plaintiff also alleges generally that "Labor Ready temporary employees as a class include employees

---

**13.** The Fourth Circuit, in an unpublished, *per curiam* opinion recognized that in light of the *Gilmer* decision and its enforcement of an arbitration agreement for a discrimination claim, "the question of whether West Virginia would enforce an arbitration agreement to prohibit a judicial remedy for its WVHRA claims is 'genuinely unsettled.'" *Price v. Goals Coal Co.*, 161 F.3d 3, 1998 WL 536371, *5 (4th Cir.(W.Va.)).

**14.** Plaintiff states in his memorandum in support of his motion to amend complaint, "[i]n the instant case, it has been established that

Defendants employed the laborers for FLSA purposes, that they meet the statutory dollar requirement, and it cannot be disputed that some of the workers were engaged in commerce to trigger the FLSA's protection for all Defendant's employees." (Pl.'s Mem. in Suppt.Mot.Amend at 2–3.) Labor Ready, in its motion to dismiss state wage claims states, "Plaintiff has admitted (and it cannot be disputed) that Labor Ready and its employees are covered by the FLSA." (Def.'s Mot.Dismiss State Claim at 2.)

who are seamen and people who transport people and goods in interstate commerce." (*Id.*) The plaintiff has not alleged that either he, or any of the other opt-in plaintiffs, worked for Labor Ready directly in the transportation industry. (*See id.*)

The United States Supreme Court recently addressed and resolved the precise issue raised by the plaintiff with respect to whether the exclusion in section 1 of the FAA applies to all employees who "engage[ ] in foreign or interstate commerce." 9 U.S.C. § 1. In *Circuit City Stores Inc. v. Adams*, 532 U.S. 105, 121 S.Ct. 1302, 149 L.Ed.2d 234 (2001), the Supreme Court considered the question of whether employment contracts involving commerce fall under the specific part of the section 1 exclusion for contracts involving the "employment of seamen, railroad employees, or any other class of workers engaged in foreign or interstate commerce." The Court concluded that inasmuch as only contracts "involving commerce" fall under the FAA's purview, if the phrase "engaged in foreign or interstate commerce" were read broadly to exclude from the FAA any employment contract of an individual who was involved in commerce, then the section 1 exclusion would be rendered meaningless, as all employment contracts would be excluded from the FAA. *Id.* at 1308. The Court applied the maxim of *ejusdem generis* to conclude that the general words of "any other class of workers engaged in foreign or interstate commerce," following the more specific words of "seamen, railroad employees," are to be construed as embracing only those objects similar in nature to the specific objects. *Id.* at 1308–09. Thus, the Court concluded that only the employment contracts of transportation workers fall under the section 1 exclusion. *Id.* at 1313.

The United States Supreme Court having concluded that only contracts of employment of workers in the transportation industry are excluded from the FAA, and there being no suggestion that the named plaintiff or any other opt-in proposed class members were working in the transportation industry through Labor Ready, the court concludes that the Labor Ready employment application falls under FAA's scope.

### F. *Opportunity for Class Action*

 The plaintiff maintains that arbitration would interfere with the opportunity for class action relief and eliminate any means of effective redress. Plaintiff cites to two opinions in which courts have declined to enforce arbitration clauses as a result of the inability of litigants to maintain class actions. One is a bankruptcy case from the northern district of Alabama, and the other is a district court case which has been reversed in relevant part by the United States Supreme Court. *See In re Knepp*, 229 B.R. 821 (Bkrtcy. N.D.Ala.1999) (in proposed class action by debtor against credit agency alleging fraud and civil conspiracy in violation of state law, court declined to enforce arbitration clause contained in a "buyer's order" for the purchase of an automobile, holding "unless there is a showing that the consumer entered the arbitration agreement voluntarily, the contract will be unenforceable as an encroachment on the right to trial by jury"); *Randolph v. Green Tree Financial Corp.*, 991 F.Supp. 1410 (M.D.Ala.1997); *aff'd*, 178 F.3d 1149, (11th Cir.1999); *reversed in relevant part by*, 531 U.S. 79, 98, 121 S.Ct. 513, 148 L.Ed.2d 373 (2000) (Supreme court stating, "mindful of the FAA's purpose 'to reverse the longstanding judicial hostility to arbitration agreements,'" determining that arbitration agreement that is silent to issue of allocation of arbitration costs and fees is not *per se* unenforceable on theory that it fails to affirmatively protect a party from

potentially steep arbitration costs) (quoting *Gilmer v. Interstate/Johnson Lane Corp.*, 500 U.S. 20, 24, 111 S.Ct. 1647, 114 L.Ed.2d 26 (1991)); *remanded to* 244 F.3d 814, 818 (11th Cir.2001)

The court does not consider *Knepp* to be persuasive authority and *Randolph* has been overruled in relevant part by the United States Supreme Court. *Knepp's* holding, which apparently creates a rebuttable presumption of the invalidity of an arbitration agreement, is contrary to the pronouncement of the United States Supreme Court that courts are to give "due regard ... to the federal policy favoring arbitration, and ambiguities as to the scope of the arbitration clause itself must be resolved in favor of arbitration." *Volt Information Sciences, Inc. v. Board of Trustees of Leland Stanford Junior University*, 489 U.S. 468, 476, 109 S.Ct. 1248, 103 L.Ed.2d 488 (1989).

The court finds persuasive a well-reasoned Third Circuit opinion examining whether the inability of parties to bring a class action in arbitration proceedings renders invalid the arbitration clause. In *Johnson v. West Suburban Bank*, 225 F.3d 366 (3rd Cir.2000), *cert denied*, 531 U.S. 1145, 121 S.Ct. 1081, 148 L.Ed.2d 957 (2001), a borrower brought a putative class action against lenders alleging that they violated the Truth in Lending Act ("TILA") and Electronic Fund Transfer Act ("EFTA") by failing to properly disclose high interest rates charged for short-term loans and requiring borrowers to consent to an electronic fund transfer scheme to obtain such loans. *Id.* at 368–69. The Third Circuit rejected the district court's conclusion that an arbitration clause contained in the loan document was invalid because there was an "inherent conflict" between compelling arbitration and the maintenance of class claims under the TILA and EFTA. *Id.* at 368 (quoting

district court opinion). The court reasoned, "[b]ecause neither the TILA nor the EFTA explicitly precludes the selection of arbitration instead of litigation, a party who agrees to arbitrate, but then asserts that his or her statutory claim cannot be vindicated in an arbitral forum, faces a heavy burden." *Id.* at 368. The court found that while class actions may offer a means of meaningful redress of small monetary violations of TILA, class actions are not necessary to fulfill the goals of TILA. *Id.* at 373. Citing to the United States Supreme Court decision of *Mitsubishi Motors Corp. v. Soler Chrysler–Plymouth, Inc.*, 473 U.S. 614, 105 S.Ct. 3346, 87 L.Ed.2d 444 (1985), the court noted that plaintiffs who proceed in the arbitration forum maintain the full range of substantive rights created by TILA. Specifically, the court observed that inasmuch as attorney fees were recoverable under the TILA, they are also available in arbitration and that attorneys should, therefore, not be deterred from bringing TILA claims with small monetary amounts in dispute. *Id.* at 374. The court concluded that even if the statutes at issue implied a right to proceed as a member of a class, "rights of this nature are waivable so long as the rights the statute was designed to protect may be vindicated by other means." *Id.* at 378. The court noted that it did "not think this unfair." *Id. See also Gilmer v. Interstate/Johnson Lane Corp.*, 500 U.S. 20, 111 S.Ct. 1647, 114 L.Ed.2d 26 (1991) (rejecting plaintiff's contention that arbitration for Age Discrimination in Employment Act was invalid since arbitration procedures did not provide for broad equitable relief and class actions, and affirming order of mediation, concluding that applicable arbitration rules vested arbitrator with broad power to afford relief and that Equal Employment Opportunity Commission was not precluded from seeking class-wide and equitable relief); *Randolph v.*

*Green Tree Financial Corp.*, 244 F.3d 814, 818 (11th Cir.2001) (on remand from the United States Supreme Court, agreeing with *Johnson* that parties can contractually waive right, by executing arbitration agreement, to proceed via class action); *Bowen v. First Family Financial Services, Inc.*, 233 F.3d 1331, 1338 (11th Cir. 2000) (same).[15]

There is no language in the FLSA which expressly prohibits an individual from contractually waiving his right to assert FLSA claims via a class action mechanism. Considering the federal policy favoring arbitration and the Supreme Court's admonition to apply valid arbitration agreements wherever possible, the court concludes that the plaintiff has entered into a valid contract to arbitrate any employment related issues thereby waiving his right to proceed as a part of a class action under 29 U.S.C. § 216.

Moreover, as the Third Circuit noted in *Johnson*, it appears that plaintiff can effectively pursue his FLSA claims in the arbitral forum without the benefit of a class action. A prevailing plaintiff under the FLSA is entitled to unpaid minimum wages, unpaid overtime compensation, as well as liquidated damages of an equal amount. 29 U.S.C. § 216(b). A prevailing plaintiff under the FLSA is also entitled to reasonable attorney fees and costs. *Id.* These remedies are available for a successful FLSA litigant in either the judicial or the arbitral forum. *See Mitsubishi*, 473 U.S. at 626, 105 S.Ct. 3346. While legal representation for individual claims with small amounts at stake in the arbitral forum may lack the vigor of legal representation for large class actions proceeding in a judicial forum, attorneys should nevertheless not be dissuaded from bringing individual FLSA claims of a small monetary value within the arbitration forum, particularly when, as here, there are a large number of related cases.

### III. Conclusion

For the reasons stated, it is ORDERED that Labor Ready's motion to compel arbitration and stay proceedings, filed November 8, 2000, be, and it hereby is, granted insofar as it seeks an order referring the case to arbitration and a stay of proceedings relating to the parties currently in this case.[16]

---

**15.** A court cannot order class action arbitration of claims unless the arbitration provision permits the maintenance of class actions. *See, e.g., Champ v. Siegel Trading Co., Inc.*, 55 F.3d 269, 271 (7th Cir.1995); *Government of United Kingdom v. Boeing Co.*, 998 F.2d 68, 71.

**16.** Labor Ready's motion to compel arbitration relates exclusively to the representative plaintiff Adkins. The court does not have before it any documentation relating to the arbitration agreements executed by the opt-in plaintiffs, nor does it have any information relating to the conditions surrounding the execution of these arbitration agreements. It appears, however, based upon the parties' representations, that every Labor Ready applicant, including every opt-in class member, has executed an arbitration agreement identical to that executed by Adkins, as a part of the standard, company-wide Labor Ready employment application. (*See* Pl.'s Opp.Motion Compel Arbitration at 2, stating that "[p]ersons seeking to be referred to a worksite by Defendants are required to complete an application, in which they state their work experience and trade skills, authorize Labor Ready to contact previous employers, consent to drug/alcohol testing in the event of work-related injury or illness, sign a release of claims against Labor Ready's customers, promise to follow Labor Ready's rules and acknowledge and agree to Defendants' 'Policy Regarding Dispatch Procedures, Employment and Arbitration;'" Def.'s Mem. in Suppt.Mot.Compel Arbitration at 8, referring to Labor Ready's "standard company-wide employment applications.") If the opt-in plaintiffs have executed the same arbitration agreement under substantially the same conditions as Adkins, the court's reasoning and analysis as delineated above would apply to their claims, as well.

647

It is ORDERED that plaintiff Curtis Adkins and defendants Labor Ready Incorporated and Labor Ready Mid–Atlantic submit to arbitration the claims raised in this civil action relating to these parties, in accordance with the terms of the arbitration agreement executed by Adkins on June 25, 2000.